**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
CASE NUMBER:

**SOHAIL KIYANI**

                              Plaintiff,

vs.

**DAVID FUNDORA, in his individual capacity;**
**JASON GUEVARA, in his individual capacity;**
**ROBERT CARPENTER, in his individual capacity;**
**JERRY OBRAY, in her individual capacity;**
**ALEXANDER PEREZ, in his individual capacity;**
**THOMAS GROB, in his individual capacity;**
**RICARDO SAFFORD, in his individual capacity;**
**ANDREW RICHTER, in his individual capacity;**
**and RIC L. BRADSHAW, in his capacity as**
**Sheriff of Palm Beach County, Florida,**

                              Defendants.

_____ /

## COMPLAINT

        COMES NOW Plaintiff, Sohail KIYANI (hereinafter KIYANI or Plaintiff), by and through

undersigned counsel and sues Defendants DAVID FUNDORA, JASON GUEVARA, ROBERT

CARPENTER, JERRY OBRAY, ALEXANDER PEREZ, THOMAS GROB, RICARDO

SAFFORD, ANDREW RICHTER, each in their individual capacity, and RIC L. BRADSHAW in

his capacity of Sheriff of Palm Beach County, Florida, as follows:

## JURISDICTION AND VENUE

        1.      The Plaintiff in this action seeks relief under the First, Fourth, and Fourteenth

Amendments of the United States Constitution, the Civil Rights Act of 1871, 42 USC 1983, Article

I section 23 Right to Privacy of Florida's Constitution, including compensatory damages, punitive damages, costs, and attorney's fees pursuant to 42 U.S.C. §1988.

2.     Venue is proper in the Southern District Court of Florida, pursuant to 28 U.S.C. 1391 (b), as all Defendants work and/or reside in this District, and all of the acts and omissions giving rise to this action occurred in Palm Beach County.

3.     The Court has federal question jurisdiction over the Plaintiff's federal law claims, pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 (a)(3). Plaintiff's state law claims are related to these federal claims and form a part of the same case or controversy.

4.     The Court accordingly has supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367 (a).

5.     All conditions precedent to the filing of this action, including those set in Florida Statute section 768.28 have been performed, have occurred, or have been waived.

6.     All causes of actions are alleged in addition, or in the alternative, to other causes of action.

7.     Plaintiff has retained the undersigned counsel and is obliged to pay said counsel a reasonable attorney fee.

## **PARTIES**

8.     Plaintiff SOHAIL KIYANI ("KIYANI" or "Plaintiff") was and is a resident of Palm Beach County, Florida, and is otherwise *sui juris*.

9.     KIYANI is a 43-year-old Muslim American male and a Law Enforcement Sergeant with the Palm Beach Sheriff's Office, having served with PBSO for nearly 20 years, since 2005.

10.     At the time of the October 14, 2022 incident giving rise to this Complaint, Plaintiff was a Law Enforcement Sergeant with Palm Beach Sheriff's Office, off-duty, at his home, in his capacity as a private citizen.

11.     At all times relevant, Defendant FUNDORA was employed as a certified Law Enforcement officer for Defendant PBSO and was acting under the direction and control of PBSO, as an employee of PBSO. FUNDORA participated in the unconstitutional violations and other wrongful acts that occurred on October 14, 2022, at which time he was acting within the course and scope of his employment under the color of state law. FUNDORA is and was a resident of the State of Florida and is otherwise *sui juris*.

12.     At all times relevant, Defendant GUEVARA was employed as a certified Law Enforcement officer for Defendant PBSO and was acting under the direction and control of PBSO, as an employee of PBSO. GUEVARA participated in the unconstitutional violations and other wrongful acts that occurred on October 14, 2022, at which time he was acting within the course and scope of his employment under the color of state law. GUEVARA is and was a resident of the State of Florida and is otherwise *sui juris*.

13.     At all times relevant, Defendant CARPENTER was employed as a certified Law Enforcement officer for Defendant PBSO and was acting under the direction and control of PBSO, as an employee of PBSO. CARPENTER participated in the unconstitutional violations and other wrongful acts that occurred on October 14, 2022, at which time he was acting within the course and scope of his employment under the color of state law. CARPENTER is and was a resident of the State of Florida and is otherwise *sui juris*.

14.     At all times relevant, Defendant OBRAY was employed as a certified Law Enforcement officer for Defendant PBSO and was acting under the direction and control of PBSO,

as an employee of PBSO. OBRAY participated in the unconstitutional violations and other wrongful acts that occurred on October 14, 2022, at which time she was acting within the course and scope of his employment under the color of state law. OBRAY is and was a resident of the State of Florida and is otherwise *sui juris*.

15.     At all times relevant, Defendant PEREZ was employed as a certified Law Enforcement officer for Defendant PBSO and was acting under the direction and control of PBSO, as an employee of PBSO. PEREZ participated in the unconstitutional violations and other wrongful acts that occurred on October 14, 2022, at which time he was acting within the course and scope of his employment under the color of state law. PEREZ is and was a resident of the State of Florida and is otherwise *sui juris*.

16.     At all times relevant, Defendant GROB was employed as a certified Law Enforcement officer for Defendant PBSO and was acting under the direction and control of PBSO, as an employee of PBSO. GROB participated in the unconstitutional violations and other wrongful acts that occurred on October 14, 2022, at which time he was acting within the course and scope of his employment under the color of state law. GROB is and was a resident of the State of Florida and is otherwise *sui juris*.

17.     At all times relevant, Defendant RICHTER was employed as a certified Law Enforcement officer for Defendant PBSO and was acting under the direction and control of PBSO, as an employee of PBSO. RICHTER participated in the unconstitutional violations and other wrongful acts that occurred on February 15, 2023, at which time he was acting within the course and scope of his employment under the color of state law. RICHTER is and was a resident of the State of Florida and is otherwise *sui juris*.

18.     At all times relevant, Defendant SAFFORD was employed as a certified Law Enforcement officer for Defendant PBSO and was acting under the direction and control of PBSO, as an employee of PBSO. SAFFORD participated in the unconstitutional violations and other wrongful acts that occurred on February 15, 2023, at which time he was acting within the course and scope of his employment under the color of state law. SAFFORD is and was a resident of the State of Florida and is otherwise *sui juris*.

19.     Defendant RIC L. BRADSHAW, in his capacity as Sheriff of Palm Beach County, Florida, is the Sheriff of Palm Beach County, Florida ("Sheriff Bradshaw" or "Palm Beach Sheriff's Office" or "PBSO") as organized and existing under the Constitution and laws of the State of Florida. PBSO is the governmental entity responsible, as a matter of law, for the actions of its officials, agents, and employees, and is responsible for their training, supervision, and conduct. PBSO is also responsible for ensuring that its police personnel obey the laws of the State of Florida and ensuring that its rules and regulations are followed and enforced.

## FACTUAL ALLEGATIONS

20.      KIYANI is the father of a minor, H.K., born May 4, 2022, who was approximately five (5) months old at the time of the October 14, 2022 incident.

21.     KIYANI and Garcia, the mother of H.K., signed a voluntary Acknowledgment of Paternity at birth establishing paternity.

22.     At all times, KIYANI demonstrated full commitment to the responsibilities of fatherhood to his child, H.K., providing support in an emotional and economic sense. From birth, H.K. lived exclusively with KIYANI at KIYANI's home until October 14, 2022, the date of the incident, when H.K. was taken by Garcia after instruction by PBSO officers who improperly

instituted a domestic case against KIYANI leading to a false arrest, as further outlined in this Complaint.

23.     Prior to October 14, 2022, Garcia would come and go to KIYANI's residence as she pleased. Garcia sometimes chose to stay at KIYANI's home; other times, she was absent for days at a time, leaving KIYANI to care for H.K. full-time, as he had since H.K.'s birth. In fact, just a week immediately preceding the October 14, 2022 incident, Garcia abruptly left KIYANI's home, left the State of Florida, and left the United States, while H.K. remained solely with KIYANI.

24.     On October 11, 2022, KIYANI filed Paternity Action and Related Relief with Palm Beach County Family Court, case no#50-2022-DR-008882-XXXX-MB.

### Events of October 14, 2022

25.     At approximately 7:00 pm on October 14, 2022, Defendants FUNDORA, GUEVARA, CARPENTER, and OBRAY ("Responding Defendants"), during the course and scope of their employment with PBSO, responded to a dispute over child custody at KIYANI's residence initiated by Garcia.

26.     English is not Garcia's first language. When speaking to Responding Defendants, Garcia inquired if they spoke Spanish. In broken English, Garcia explained that she came to visit the baby, H.K., and further explained her version of the events leading her to call PBSO: Garcia, while originally holding H.K., proceeded to hand over H.K. to KIYANI. In the motion, as KIYANI began to cradle H.K., and turn away with her in his two arms, Garcia fell. Garcia then stood right up.

27.     In Spanish to Defendant FUNDORA, Garcia confirmed what had occurred and explained that the fall was unintentional on KIYANI's part.

28.     In fact, Garcia clarified her prior statements in broken English and reenacted the incident to confirm that her fall was unintentional.

29.     Responding Defendants had an opportunity to confirm that Garcia's fall was unintentional and did confirm that her fall was in fact unintentional and not otherwise caused by KIYANI.

30.     Responding Defendants' conclusion that Garcia's fall was unintentional was consistent with Garcia's own statements.

31.     Garcia confirmed that neither she, nor H.K., had any injuries.

32.     Garcia was clear that her fall was unintentional and that KIYANI did not intend to touch her as he took hold of H.K.

33.     Responding Defendants investigated and then concluded there was no allegation of a crime, no crime had been, or was being committed.

34.      Responding Defendants expressed their intent to document the incident in a manner consistent with their "no crime" determination, which would result in no adverse action being taken against KIYANI.

35.     Defendant GUEVARA then instructed Garcia to leave the premises.

36.     In violation of "Official" PBSO policy, Defendant FUNDORA added, in a loud whisper, "WITH THE BABY" then instructed Garcia to put H.K. in Garcia's car and to leave the premises with H.K.

37.     GUEVARA did what has become tantamount to an official policy of PBSO—he took it upon himself to adjudicate a civil custody dispute in favor of the mother based solely on gender and caused H.K. to be removed from her home since birth.

38.     ***KIYANI's Protected Speech.*** In a non-confrontational manner, as he stood on his front lawn, KIYANI verbally objected to the removal of H.K. without his permission. Specifically, KIYANI stated something to the effect of: "She [Garcia] cannot leave with the baby [H.K.]."

39.     KIYANI's protected speech, objecting to the removal of his daughter from her home where she had resided since birth, set into motion the basis of this Complaint: Responding Defendants, together with Defendant GROB suddenly reversed their "no crime" determination, manufactured a finding of probable cause, expressed racial discrimination (calling KIYANI who is Muslim a "terrorist") and ultimately caused the wrongful seizure/detention, arrest, and incarceration of KIYANI.

40.     ***Retaliation for Protected Speech: KIYANI is detained for three hours, then arrested and transported to jail.*** Upon KIYANI objecting to the removal of his daughter, Responding Defendants formed a physical and visual barrier between KIYANI and H.K.

41.     "The freedom of individuals to oppose or challenge police action without thereby risking arrest is one of the characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 107 S.Ct. 2502, 25010 (1987). Speech is protected under the First Amendment of the U.S. Constitution as long as it does not physically obstruct the officer and is not "likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Id.* at 2510.

42.     OBRAY aggressively stood up close to KIYANI's face telling him to "back off" and that Garcia was taking the baby.

43.     KIYANI tried to plead, to no avail, that he is the primary caretaker of his daughter H.K., that H.K. resided at KIYANI's residence, and that his home was the only home H.K. had ever lived in. KIYANI himself a police officer and a public employee further advised as a matter

of public concern, to no avail, that the Responding Defendants could not and should not remove a minor child from a parent or the child's own home.

44.     KIYANI told Responding Defendants about his Acknowledgment of Paternity, his role as primary caretaker to H.K., Garcia's unstable behavior, and the pending Family Court Case.

45.     KIYANI, a PBSO officer himself, informed the Responding Defendants that they were wrong and had no authority to adjudicate a civil custody dispute and cause H.K. to be removed from his lawful custody. In other words, Responding Defendants cannot decide custody disputes or act in lieu of a court order by, for instance, instructing Garcia to remove H.K. from KIYANI's (and H.K.'s) home.

46.     By causing H.K. to be removed from her home and from her father, Responding Officers were adjudicating a civil custody dispute—in favor of the female—in violation of the official prohibition.

47.     KIYANI then called on-duty Captain PEREZ notifying him that officers were trying to remove his daughter from his lawful custody. PEREZ stated that he was on his way to the scene, but he failed to respond, intervene, or stop the improper acts of his subordinates.

48.     Without provocation and without cause, GUEVARA threatened to arrest KIYANI, stating that KIYANI's police cruiser parked at his home was saving him from going to jail, to which KIYANI replied that it would be a bad arrest.

49.     FUNDORA stated to KIYANI that KIYANI "would see who was wrong."

50.     GUEVARA, aware that KIYANI is a South Asian and Muslim, uttered "**fuckin terrorist**" directed at KIYANI.

51.     The Responding Officers, by means of a show of authority, restrained KIYANI's liberty such that KIYANI was not free to leave.

52.     By approximately 8:30 pm, five additional officers arrived at KIYANI's residence including the defendant, Detective GROB.

53.     Defendant GROB referred to the response as a "dog and pony show."

54.     Defendant GROB obtained a sworn statement from Garcia and then a post-Miranda sworn statement from KIYANI; importantly, both gave consistent statements.

55.     Garcia confirmed that she ripped a doorbell camera from the wall, in response, KIYANI then took hold of H.K. in a cradling position with both hands, Garcia letting KIYANI do so. Garcia confirmed that she unintentionally fell as KIYANI turned away because she simultaneously let go and lost her balance.

56.     By approximately 10 pm, KIYANI was confused about being detained for three hours and questioned about a civil custody dispute, disturbingly not allowed back into his home without a police escort!

57.     At that point, around 10 pm, KIYANI provided videos from his surveillance cameras.

58.     The video depicts the events consistent with both Garcia's and KIYANI's separate statements.

59.     The video reveals that in a fit of rage, Garcia rips KIYANI's doorbell camera that was affixed to a concrete wall and throws it to the ground while holding H.K. in one arm.

60.      Concerned for H.K., KIYANI reacts by placing his arms under H.K. in a cradling position in an effort to protect her from any harm, securing H.K. in his arms and turning away. KIYANI did not actually touch Garcia and did not intend to touch her either.

61.     Garcia loses her grip/balance of KIYANI, and hits roller-skates that are on the floor with both feet as KIYANI turns away and falls, then she immediately stands up.

62.     ***The Unlawful Arrest.*** GROB arrested KIYANI at 10:15 pm concluding, contrary to the video and contrary to Garcia's own statement, that KIYANI had committed a simple battery against Garcia.

63.     Defendant GUEVARA, amongst others, was present and aware of the absence of probable cause but nonetheless participated in the arrest as KIYANI was handcuffed and placed in the backseat of Guevara's patrol car.

64.     ***The "Probable Cause" Affidavit.*** GROB authored his "Probable Cause" Affidavit that contained false statements and material omissions as there was no probable cause and no arguable probable cause to arrest KIYANI. GROB opined, contrary to the statements of Garcia and KIYANI, and contrary to the irrefutable video, that Garcia was thrown against her will.

65.     GROB charged Plaintiff with one count of simple battery (domestic) though none of the elements were present.

66.     Specifically, GROB concluded, contrary to all the evidence, that a "battery" occurred "when KIYANI quickly turned away as he pulled the child toward him. This action caused Garcia to be thrown to the ground forcefully against her will. Garcia quickly stood up..."

67.     GROB's own observations of the video suggests that KIYANI did not intend to touch Garcia in any fashion as KIYANI was turning away while holding the baby in his arms.

68.     The charge was "no-filed" by the Palm Beach State Attorney's Office, meaning the State Attorney's Office declined to press charges against KIYANI.

69.     KIYANI, a Law Enforcement Sergeant with the Palm Beach Sheriff's Office, was seized/detained for three hours at his home and then arrested.

70.     KIYANI was arrested and his hands were placed behind his back.

71.     KIYANI was then placed in Defendant GUEVARA's police car and incarcerated overnight at the Palm Beach County Jail.

72.     At all times relevant, KIYANI was aware that he was being confined at his home and then taken into custody.

73.     Responding Defendants directed Garcia to leave with H.K. after arresting KIYANI.

74.     Subsequently, under oath, PBSO Internal Affairs employee, Defendant Sergeant Ricardo Safford conducted an administrative investigation. Under oath, Defendant Sergeant SAFFORD conceded that Garcia did not tell GROB that she was touched by KIYANI. Defendant Sergeant SAFFORD also conceded that, when he reviewed the video, he could not see KIYANI's hands actually touching Garcia.

75.     Similarly, Captain Nichole Addazio, a PBSO Captain, admitted under oath that when she reviewed the video, she did not observe KIYANI touch Garcia.

76.     Critically, Captain Addazio agreed that KIYANI's intent was to touch H.K., not Garcia.

77.     Both Sergeant Safford and Captain Nichole Addazio admitted that they did not see KIYANI touch Garcia on the video and Captain Addazio added that KIYANI's intent was to touch the baby, not Garcia.

78.     The testimony of Defendant SAFFORD and Captain Addazio further demonstrate that Defendant GROB lacked probable cause or even arguable probable cause to arrest KIYANI as battery requires intentional contact with Garcia and KIYANI did not intend to touch Garcia.

79.     Any officer acting reasonably under the circumstances would have recognized that no battery was committed and would have also considered the context and consistent statements of Garcia and KIYANI.

80.     The actions of each individual defendant were objectively unreasonable under the circumstances.

81.     **Damage to KIYANI.** Aside from H.K. being removed from the only home she had lived in by PBSO, news of the arrest was publicized in local news publications with KIYANI's name and photo, including a story on the nightly local news named "KIYANI".

82.     None of the Responding Officers or others reported anything improper or unusual about the occurrence at KIYANI's home. The officers on scene consider violation of rights, retaliation, seizures, and wrongful arrests to be consistent with the policy, custom, practice, and training of PBSO, and/or the officers on scene are not properly trained as to the rights of individuals to engage in protected speech concerning police officers and are not properly trained as to the rights of unwed fathers.

83.     ***Defendants Violated KIYANI's Clearly Established Constitutional Rights.*** At the time of the incident, KIYANI had both Federal and State clearly established constitutional rights, including:

> (1) First Amendment Right to Freedom of Speech; U.S. Const. Amend. 1
>
> (2) Fourth Amendment Rights to be free from unreasonable searches and seizures. U.S. Const. Amend. 4
>
> (3) Fourteenth Amendment Rights to Due Process and Equal Protection of the Laws. U.S. Const. Amend. 14.
>
> (4) Privacy Rights to be free from Governmental Intrusion, Florida Const. Art. 1, Sec. 12; U.S. Const. Amend. 14

84.     ***PBSO has a pervasive practice of failing to train officers regarding the constitutional rights of unwed fathers.*** PBSO has a duty to ensure that its officers are trained in the fundamental constitutional rights of free speech and in the rights of parents to be free from state interference in the rearing of their children without cause.

85.     PBSO, as a matter of policy or practice, has failed to adequately train, supervise, or discipline police officers who violate the rights of citizens like KIYANI, thus encouraging the individual defendant police officers to engage in unlawful conduct alleged herein.

86.      PBSO, as a matter of policy or practice, fails to train officers to refrain from adjudicating custody disputes in favor of the mother and against the unwed father.

87.     Though civil child custody disputes are among the most common police calls, PBSO has failed to adequately train its officers to refrain from overstepping their lawful authority in civil custody disputes. Training materials are inadequate at best.

88.     PBSO has failed to adequately train its officers to refrain from acting in the place of a court order as officers did when they instructed Garcia to leave the home H.K. resided in with H.K.

89.      PBSO maintained a custom of deliberate indifference to the constitutional rights of unwed fathers to be free from unwarranted governmental intrusion.

90.     PBSO's command structure either contributed to or failed to intervene in the constitutional violations.

91.     PBSO's refusal to properly train and/or supervise in how to address non-threatening citizens exercising both their right to verbally disagree and raise their children without state interference has resulted in the violation of constitutional rights and irreparable harm to unwed fathers.

92.     PBSO's lack of training, supervising, or disciplining causes violations of fundamental constitutional rights to unwed fathers such as KIYANI in that ill-equipped officers do what is prohibited: they take it upon themselves to adjudicate civil custody disputes and to do so on the basis of gender, in favor of the mother and against the unwed father.

93. ***PBSO's Pervasive Practice in disregard of the rights of Unwed Fathers is the functional equivalent of a Policy***. PBSO's lack of training, supervision, and discipline is apparent from the following instances wherein responding officers discriminated against unwed fathers solely based on their gender, citing a "natural guardian" statute (§744.301, Fla. Stat.) that does not, in any fashion, authorize PBSO to resolve custody disputes by directing that a minor be handed off from the father to the mother.

94. These instances of causing a child to be relocated from father to mother (in violation of the prohibition against enforcing civil statutes) evidence a practice or custom of PBSO that is so pervasive as to be the functional equivalent of a policy adopted by PBSO:

    a. On January 28, 2024, in Belle Glade, PBSO deputies met with parents of a baby at the father's home. There were serious safety concerns for the child's well-being with the mother. DCF was involved and concluded that the baby was safe with the father and assisted the family with resources. However, the following day, a PBSO supervisor responded to the father's home and threatened to criminally charge the father if he did not give the child to the mother.

    b. On July 10, 2023, in West Palm Beach, PBSO allowed the mother of a 5 year old to leave with the child after she decided to move out of the home shared with the father, despite objections from the father and based solely on gender.

    c. On November 13, 2022, in West Palm Beach, PBSO officer advised the couple in the midst of a court custody proceeding that the mother could move anywhere with the child because the child was born out of wedlock

    d. On April 1, 2021, in Greenacres, Florida, PBSO officer, enforced section 744.301 against the father of three minor children and filed a felony interference with Custody charge after a brief disagreement about what time the father would return the kids to the mother.

    e. On July 6, 2021, in Greenacres, Florida, PBSO officer ordered a father to return his child to the mother after the mother assaulted the father while the child was in his custody. She admitted the father pays her child support and they are co- parents.

    f. On December 22, 2019, in Wellington, Florida, PBSO officer investigated a custody dispute between parents of a minor at the mall and maintained the status quo. However, the following day, a different PBSO officer responded to the father's residence, and forced the father to turn over the child to the mother.

g.  On August 14, 2017, in Boca Raton, Florida, PBSO officer and a Sergeant removed a 3 year old from the father's custody and gave him to the mother, even giving both a ride in his patrol vehicle.

h.  On July 2, 2016, in West Palm Beach, Florida, PBSO officer had a father reluctantly give his daughter who had been in his custody for months to the mother who then refused to even take the child.

i.  On April 9, 2016, in Loxahatchee, Florida, PBSO officer dealt with a custody dispute between unwed parents at the father's house where the children were staying. The parents agreed that the mother would take the one year old while the six year old would remain with the father. A few hours later, however, at 3am, PBSO Sergeant ordered the officer to return to the father's home and to force the father to turn over the six year old to the mother based solely on gender.

95.     In each of the above instances, PBSO took no disciplinary or remedial action to prevent PBSO officers from acting as the arbiters of civil custody disputes, resolving the disputes on the basis of gender and in favor of the mother, and in violation of fundamental rights of unwed fathers to be free from unwarranted governmental intrusion.

96.     PBSO's Custom and Practice include:

a.  failing to institute a policy or training addressing civil child custody disputes and the limited scope of Police Officer jurisdiction;
b.  failing to institute a policy or training regarding civil child custody disputes and the appropriate response of advising the parties to obtain relief in court and not by way of an officer's intervention
c.  failing to institute a policy or training to prevent police officers from facilitating the movement of a child from the unwed father to the mother
d.  failing to ensure officers were trained or sufficiently educated in child custody disputes and their role as "peacekeeper", not arbiters of disputes;
e.  improperly training PBSO Officers in a way that condones and permits their officers to violate the rights and inflict harm upon citizens exercising their constitutional rights;
f.  failing to train officers as to the constitutional right of privacy and to be free from unwarranted governmental interference;
g.  Deliberate indifference by failing to ensure Officers are properly reviewed, counseled, educated, and trained regarding First Amendment speech rights.

97.     PBSO's deliberate indifference, failure to train, failure to effectively supervise, and tolerance of the practices stated above was the moving force that caused the unlawful deprivation

of Plaintiff's constitutional rights, including Plaintiff's Federal First and Fourteenth Amendment

Rights and Privacy Rights under the Florida Constitution

98.     The failure of PBSO to investigate the violation of fundamental rights of its citizens

and to institute appropriate disciplinary and retraining action in the wake of them, condones the

egregious misconduct of the officers involved. PBSO's inaction amounts to a de facto policy and

custom of condoning and tolerating the violating of fundamental constitutional rights of citizens.

99.      The patterns of constitutional violations by PBSO officers stem from systemic

deficiencies in training and supervision.

100.     ***Subsequent Retaliation against KIYANI.*** Beginning on or about February 13,

2023, Plaintiff, in his capacity as a private citizen, emailed two PBSO employees, including

Defendant Safford requesting PBSO's policies related to firearms of private citizens being placed

into evidence. A few emails ensued between the parties, including KIYANI's request for PBSO's

policies:

> *Pat,*
> *Evidence told me that the process to return my personal firearm requires approval from*
> *legal and a background check. Why was it submitted into evidence, test fired, entered into*
> *NIBIN when it could have been put in the armory and easily returned to me? It*
> *was irrelevant to any criminal case. If you can please guide me to the policy that*
> *supports such action within VCD. I.A can advise if there is such a policy on the*
> *administrative end.*
>
> *Thanks*

101.     KIYANI, as a private citizen, has a First Amendment right to seek out public

records. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019) ("[A]

citizen's public records requests... can clearly constitute protected First Amendment activity.")

102.     In response to KIYANI's emails, Defendant RICHTER threatened retaliation in the

form of additional discipline though there was nothing improper about KIYANI's emails or request

for information.

103.     As a result of Plaintiff's email, Defendant SAFFORD ultimately added an Insubordination charge against Plaintiff for addressing Defendant OBRAY by her first name, Jerry, resulting in adverse action in the form of an 8 hour suspension without pay. This is despite Obray never complaining of or reporting insubordination on her own. Rather, Defendant SAFFORD sought out Defendant OBRAY to find an additional basis to punish Plaintiff for exercising his First Amendment right to obtain information about PBSO policies.

104.     The additional Insubordination charge was the direct result of KIYANI engaging in protected speech as a private citizen.

## COUNT I
## FIRST AMENDMENT FREE SPEECH RETALIATION,
## COGNIZABLE UNDER 42 U.S.C. § 1983
## (DEFENDANT FUNDORA)

105.     Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

106.     Defendant Fundora's detention/seizure of Plaintiff leading to his arrest was in retaliation for Plaintiff questioning Fundora's instructions to Garcia to leave the premises where H.K. had resided since birth *with H.K.*

107.     Fundora's detention/seizure of Plaintiff was in the absence of probable cause, or arguable probable cause that Plaintiff had committed any criminal offense.

108.     The actions of Fundora constituted unlawful retaliation against protected speech in violation of Plaintiff's clearly established First Amendment and Fourteenth Amendment Constitutional Rights, and 42 U.S.C. § 1983.

109.     It was clearly established at all times relevant that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill,* 107 S.Ct 2502, 2509 (1987).

110.    It was clearly established at all times relevant that the "freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 107 S.Ct 2502, 2510 (1987).

111.    Fundora had ill-will towards Plaintiff and his participation in the unlawful seizure and subsequent arrest without probable cause would deter a person of ordinary firmness from the exercise of First Amendment rights.

112.    Had Fundora not had any ill-will toward Plaintiff, Plaintiff would not have been seized for three hours and then arrested.

113.    Defendant Fundora was subjectively motivated to retaliate against the protected speech by stating to KIYANI that he "would see who is wrong".

114.    In the absence of Plaintiff's protected speech, Fundora would not have seized Plaintiff for three hours and enabled or participated in the unlawful arrest of KIYANI. Fundora, with the other Responding Defendants, would have completed a supplemental report as they agreed to do moments before KIYANI engaged in protected speech.

115.    Fundora, under color of law, retaliated against Plaintiff, in a gross disregard of Plaintiff's constitutional rights.

116.    As a direct and proximate result of the allegations herein, in violation of 42 U.S.C. § 1983, Plaintiff has suffered damages. He has been brought into public scandal, with great humiliation, mental suffering, and a damaged reputation.

117.    As a result, Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, and medical and legal expenses. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit; attorney fees pursuant to 42 U.S.C. § 1988 (d) Trial by jury for triable issues; and (e) Such additional relief as the Honorable Court may deem just.

<u>COUNT II</u>
**FIRST AMENDMENT FREE SPEECH RETALIATION,**
**COGNIZABLE UNDER 42 U.S.C. § 1983**
**(DEFENDANT GUEVARA)**

118.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

119.    Defendant Guevara's detention/seizure of Plaintiff leading to his arrest was in retaliation for Plaintiff questioning Responding Defendants' instructions to Garcia to leave the premises where H.K. had resided since birth <u>*with H.K.*</u>

120.    Guevara's detention/seizure of Plaintiff was in the absence of probable cause, or arguable probable cause that Plaintiff had committed any criminal offense.

121.    The actions of Guevara constituted unlawful retaliation against protected speech in violation of Plaintiff's clearly established First Amendment and Fourteenth Amendment Constitutional Rights, and 42 U.S.C. § 1983.

122.    It was clearly established at all times relevant that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill,* 107 S.Ct 2502, 2509 (1987).

123.     It was clearly established at all times relevant that the "freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 107 S.Ct 2502, 2510 (1987).

124.   Guevara had ill-will towards Plaintiff and his participation in the unlawful seizure and subsequent arrest without probable cause would deter a person of ordinary firmness from the exercise of First Amendment rights.

125.   Had Guevara not had any ill-will toward Plaintiff, Plaintiff would not have been seized for three hours and then arrested.

126.   Defendant Guevara had ill-will towards Plaintiff evident from Guevara's threat of arrest which occurred moments after Guevara concluded no crime had been or was being committed and a supplemental report would be done.

127.   "The threat of arrest is the quintessential retaliatory conduct that would deter a person of ordinary firmness from exercising First Amendment rights." *Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023).

128.   In the absence of Plaintiff's protected speech, Guevara would not have seized Plaintiff for three hours and then enabled or participated in the unlawful arrest of KIYANI. Guevara, with the other Responding Defendants, would have completed a supplemental report as they agreed to do moments before KIYANI engaged in protected speech.

129.   Guevara, under color of law, retaliated against Plaintiff, in a gross disregard of Plaintiff's constitutional rights.

130.   As a direct and proximate result of the allegations herein, in violation of 42 U.S.C. § 1983, Plaintiff has suffered damages. He has been brought into public scandal, with great humiliation, mental suffering, and a damaged reputation.

131.   As a result, Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, and medical and legal expenses. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit; attorney fees pursuant to 42 U.S.C. § 1988 (d) Trial by jury for triable issues; and (e) Such additional relief as the Honorable Court may deem just.

**COUNT III**
**FIRST AMENDMENT FREE SPEECH RETALIATION,**
**COGNIZABLE UNDER 42 U.S.C. §1983**
**(DEFENDANT CARPENTER)**

132.     Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

133.     Defendants Carpenter's detention/seizure of Plaintiff leading to his arrest was in retaliation for Plaintiff questioning Responding Defendants' instructions to Garcia to leave the premises where H.K. had resided since birth *with H.K.*

134.     Carpenter's detention/seizure of Plaintiff was in the absence of probable cause, or arguable probable cause that Plaintiff had committed any criminal offense.

135.     The actions of Carpenter constituted unlawful retaliation against protected speech in violation of Plaintiff's clearly established First Amendment and Fourteenth Amendment Constitutional Rights, and 42 U.S.C. § 1983.

136.     It was clearly established at all times relevant that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill,* 107 S.Ct 2502, 2509 (1987).

137.      It was clearly established at all times relevant that the "freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 107 S.Ct 2502, 2510 (1987).

138.    Carpenter had ill-will towards Plaintiff and his participation in the unlawful seizure and subsequent arrest without probable cause would deter a person of ordinary firmness from the exercise of First Amendment rights.

139.    Had Carpenter not had any ill-will toward Plaintiff, Plaintiff would not have been seized for three hours then arrested.

140.    Defendant Carpenter was subjectively motivated to retaliate against the protected speech by forming a physical barrier between KIYANI and H.K. and his willingness to participate in the unlawful detention and arrest even though, moments before Plaintiff's engaged in protected speech, it was agreed that no crime had occurred.

141.    In the absence of Plaintiff's protected speech, Carpenter would not have seized Plaintiff for three hours and then enabled or participated in the unlawful arrest of KIYANI. Carpenter and the other Responding Defendants would have completed a supplemental report as they agreed to do moments before KIYANI engaged in protected speech.

142.    Carpenter, under color of law, retaliated against Plaintiff, in a gross disregard of Plaintiff's constitutional rights.

143.    As a direct and proximate result of the allegations herein, in violation of 42 U.S.C. § 1983, Plaintiff has suffered damages. He has been brought into public scandal, with great humiliation, mental suffering, and a damaged reputation.

144.    As a result, Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, medical and legal expenses. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit; attorney fees pursuant to 42 U.S.C. § 1988 (d) Trial by jury for triable issues; and

(e) Such additional relief as the Honorable Court may deem just.

**COUNT IV**
**FIRST AMENDMENT FREE SPEECH RETALIATION,**
**COGNIZABLE UNDER 42 U.S.C. §1983**
**(DEFENDANT OBRAY)**

145.     Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

146.     Defendant Obray's detention/seizure of Plaintiff leading to his arrest was in retaliation for Plaintiff questioning Responding Defendants' instructions to Garcia to leave the premises where H.K. had resided since birth *with H.K.*

147.     Obray's detention/seizure of Plaintiff was in the absence of probable cause, or arguable probable cause that Plaintiff had committed any criminal offense.

148.     The actions of Obray constituted unlawful retaliation against protected speech in violation of Plaintiff's clearly established First Amendment and Fourteenth Amendment Constitutional Rights, and 42 USC §1983.

149.     It was clearly established at all times relevant that "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill,* 107 S.Ct 2502, 2509 (1987).

150.      It was clearly established at all times relevant that the "freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston v. Hill*, 107 S.Ct 2502, 2510 (1987).

151.     Obray had ill-will towards Plaintiff and her participation in the unlawful seizure and subsequent arrest without probable cause would deter a person of ordinary firmness from the exercise of First Amendment rights.

152.     Had Obray not had any ill-will toward Plaintiff, Plaintiff would not have been seized for three hours then arrested.

153.     Obray had ill-will toward Plaintiff, evident from her forming a physical barrier, aggressively instructing Plaintiff to "back off", and participating in the unlawful detention and arrest even though, moments before Plaintiff's engaged in protected speech, Obray agreed that no crime had occurred.

154.     In the absence of Plaintiff's protected speech, Obray would not have seized Plaintiff for three hours and then enabled or participated in the unlawful arrest of KIYANI. Obray and Responding Defendants would have completed a supplemental report as they agreed to do moments before KIYANI engaged in protected speech.

155.     Obray, under color of law, retaliated against Plaintiff, in a gross disregard of Plaintiff's constitutional rights.

156.     As a direct and proximate result of the allegations herein, in violation of 42 U.S.C §1983, Plaintiff has suffered damages. He has been brought into public scandal, with great humiliation, mental suffering, and a damaged reputation.

157.     Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, and medical and legal expenses. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit; attorney fees pursuant to 42 U.S.C. § 1988 (d) Trial by jury for triable issues; and (e) Such additional relief as the Honorable Court may deem just.

## COUNT V
## 42 U.S.C. § 1983- UNLAWFUL SEIZURE/DETENTION
## (DEFENDANT FUNDORA)

158.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

159.    Plaintiff KIYANI had the right under the United States Constitution to be secure from unlawful restraint of his person and liberty, which may be restricted only upon due process of law under the Fourth and Fourteenth Amendments of the United States Constitution.

160.    Defendant FUNDORA, together with the other individual Defendants present at Plaintiff's home, deprived Plaintiff of his rights under the United States Constitution in violation of 42 U.S.C. § 1983, in that these Defendants caused the illegal and prolonged detention of Plaintiff at his home for three hours.

161.    Defendant Fundora did not have reasonable suspicion or probable cause to detain Plaintiff.

162.    Defendant Fundora conceded that there was no probable cause and no arguable probable cause. Defendant Fundora concluded no crime had been or was being committed as Defendant Fundora agreed that a supplemental report would be completed confirming the absence of criminal activity—until KIYANI engaged in protected speech questioning police action.

163.    Defendant Fundora either accomplished the illegal seizure/detention, or participated in, or procured the three hour seizure/detention of Plaintiff at his home.

164.    Defendant Fundora caused Plaintiff to be deprived of his freedom and liberty and caused him to be restrained in his movement.

165.    The acts of Defendant Fundora violated Plaintiff's Fourth and Fourteenth Amendment Constitutional Rights.

166.    As a direct and proximate result, Plaintiff has suffered damages.

167.    Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, medical and legal expenses, and damage to his reputation. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit; attorney fees pursuant to 42 U.S.C. § 1988 (d) Trial by jury for triable issues; and (e) Such additional relief as the Honorable Court may deem just.

## COUNT VI
## 42 U.S.C. § 1983- UNLAWFUL SEIZURE/DETENTION
## (DEFENDANT GUEVARA)

168.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

169.    Plaintiff KIYANI had the right under the United States Constitution to be secure from unlawful restraint of his person and liberty, which may be restricted only upon due process of law under the Fourth and Fourteenth Amendments of the United States Constitution.

170.    Defendant Guevara, together with the other individual Defendants present at Plaintiff's home, deprived Plaintiff of his rights under the United States Constitution in violation of 42 U.S.C. § 1983, in that these Defendants caused the illegal and prolonged detention of Plaintiff at his home for three hours.

171.    Defendant Guevara did not have reasonable suspicion or probable cause to detain Plaintiff.

172.    Defendant Guevara conceded that there was no probable cause and no arguable probable cause. Defendant Guevara concluded no crime had been or was being committed as

Defendant Guevara stated out loud that a supplemental report would be completed confirming the absence of criminal activity—until KIYANI engaged in protected speech questioning police action.

173.    Defendant Guevara either accomplished the illegal seizure/detention, or participated in, or procured the three hour seizure/detention of Plaintiff at his home.

174.    Defendant Guevara caused Plaintiff to be deprived of his freedom and liberty and caused him to be restrained in his movement.

175.    The acts of Defendant Guevara violated Plaintiff's Fourth and Fourteenth Amendment Constitutional Rights.

176.    As a direct and proximate result, Plaintiff has suffered damages.

177.    Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, medical and legal expenses, and damage to his reputation. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit; attorney fees pursuant to 42 U.S.C. § 1988 (d) Trial by jury for triable issues; and (e) Such additional relief as the Honorable Court may deem just.

## COUNT VII
### 42 U.S.C. § 1983- UNLAWFUL SEIZURE/DETENTION
### (DEFENDANT CARPENTER)

178.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

179.    Plaintiff KIYANI had the right under the United States Constitution to be secure from unlawful restraint of his person and liberty, which may be restricted only upon due process of law under the Fourth and Fourteenth Amendments of the United States Constitution.

180.    Defendant Carpenter, together with the other individual Defendants present at Plaintiff's home, deprived Plaintiff of his rights under the United States Constitution in violation of 42 U.S.C. § 1983, in that these Defendants caused the illegal and prolonged detention of Plaintiff at his home for three hours.

181.    Defendant Carpenter did not have reasonable suspicion or probable cause to detain Plaintiff.

182.    Defendant Carpenter conceded that there was no probable cause and no arguable probable cause. Defendant Carpenter concluded no crime had been or was being committed and agreed that a supplemental report would be completed confirming the absence of criminal activity—until KIYANI engaged in protected speech questioning police action.

183.    Defendant Carpenter either accomplished the illegal seizure/detention, participated in, or procured the three hour seizure/detention of Plaintiff at his home.

184.    Defendant Carpenter caused Plaintiff to be deprived of his freedom and liberty and caused him to be restrained in his movement.

185.    The acts of Defendant Carpenter violated Plaintiff's Fourth and Fourteenth Amendment Constitutional Rights.

186.    As a direct and proximate result, Plaintiff has suffered damages.

187.    Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, medical and legal expenses, and damage to his reputation. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit; attorney fees pursuant to 42 U.S.C. § 1988 (d) Trial by jury for triable issues; and (e) Such additional relief as the Honorable Court may deem just.

**COUNT VIII**
**42 U.S.C. § 1983- UNLAWFUL SEIZURE/DETENTION**
**(DEFENDANT OBRAY)**

188.     Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

189.     Plaintiff KIYANI had the right under the United States Constitution to be secure from unlawful restraint of his person and liberty, which may be restricted only upon due process of law under the Fourth and Fourteenth Amendments of the United States Constitution.

190.     Defendant Obray, together with the other individual Defendants present at Plaintiff's home, deprived Plaintiff of his rights under the United States Constitution in violation of 42 U.S.C. § 1983, in that these Defendants caused the illegal and prolonged detention of Plaintiff at his home for three hours.

191.     Defendant Obray did not have reasonable suspicion or probable cause to detain Plaintiff.

192.     Defendant Obray conceded that there was no probable cause and no arguable probable cause. Defendant Obray concluded no crime had been or was being committed and agreed that a supplemental report would be completed confirming the absence of criminal activity—until KIYANI engaged in protected speech questioning police action.

193.     Defendant Obray either accomplished the illegal seizure/detention, or participated in, or procured the three hour seizure/detention of Plaintiff at his home.

194.    Defendant Obray caused Plaintiff to be deprived of his freedom and liberty and caused him to be restrained in his movement.

195.    The acts of Defendant Obray violated Plaintiff's Fourth and Fourteenth Amendment Constitutional Rights.

196.    As a direct and proximate result, Plaintiff has suffered damages.

197.    Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, medical and legal expenses, and damage to his reputation. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit; attorney fees pursuant to 42 U.S.C. § 1988 (d) Trial by jury for triable issues; and (e) Such additional relief as the Honorable Court may deem just.

**COUNT IX**
**42 USC §1983- FALSE ARREST/FALSE IMPRISONMENT**
**(DEFENDANT GROB)**

198.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

199.    KIYANI did not commit any act justifying that detention, seizure, or arrest.

200.    Defendant GROB proximately caused the arrest of and did arrest KIYANI in the absence of probable cause or arguable probable cause that Plaintiff committed any criminal offense.

201.    Defendant GROB spoke with Responding Defendants, reviewed the video, and spoke with KIYANI and Garcia, who both made clear that KIYANI did not touch or intend to touch Garcia.

202.    Captain Nichole Addazio, a PBSO Captain, admitted under oath that when she reviewed the video, she did not observe KIYANI touch Garcia.

203.    Critically, Captain Addazio agreed that KIYANI's intent was to touch H.K., not Garcia, and intent is an element of battery.

204.    PBSO Internal Affairs employee, Sergeant Ricardo Safford conceded that Garcia did not tell GROB that she was touched by KIYANI.

205.    The testimony of Sergeant Safford and Captain Addazio further demonstrate that Defendant GROB lacked probable cause or even arguable probable cause to arrest KIYANI as battery requires intentional contact with Garcia and KIYANI did not touch or intend to touch Garcia.

206.    To the extent there was any physical contact between KIYANI and Garcia, it was obviously unintentional, as confirmed by both Garcia and KIYANI, as well as by Responding Defendants – specifically Fundora and Carpenter confirmed that it was unintentional, and Fundora affirmed the same after speaking with Garcia.

207.    Though the elements of battery were not present and no one alleged a battery——Defendant GROB charged KIYANI with battery.

208.    Defendant GROB then arrested KIYANI, placing his hands behind his back, placing KIYANI into a police car, and transporting him to jail where he remained overnight.

209.    Defendant GROB's charge of battery was not filed by the State Attorney.

210.    The conduct of GROB toward Plaintiff was objectively unreasonable and in violation of Plaintiff's clearly established rights under the Fourth and Fourteenth Amendments and 42 U.S.C. §1983 to be free from arrest in the absence of probable cause.

211.    As a direct and proximate result of the acts alleged herein, in violation of 42 USC §1983, Plaintiff has suffered damages. He has been brought into public scandal, with great humiliation, mental suffering, and a damaged reputation.

212.    As a result, Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, and medical and legal expenses. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit; attorney fees pursuant to 42 USC 1988 and (d) Such additional relief as the Honorable Court may deem just.

## COUNT X
## FALSE ARREST/FALSE IMPRISONMENT
### (arising under Florida law)
### (DEFENDANT PBSO)

213.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

214.    KIYANI did not commit any act justifying his arrest.

215.    The actions of Defendant GROB, in causing the arrest of KIYANI in the absence of probable cause, were taken in the absence of lawful authority. The action of Defendant GROB constitutes false arrest/false imprisonment of Plaintiff under Florida law.

216.    The false arrest/false imprisonment of Plaintiff by Defendant GROB was committed by Defendant GROB in the course and scope of his employment as a Detective for Defendant PBSO.

217.    As a direct and proximate result of the acts described above, Plaintiff has suffered damages. He has been brought into public scandal, with great humiliation, mental suffering, and a damaged reputation.

218.    As a result, Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, and medical and legal expenses. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Cost of suit; (c) attorney fees; and (d) Such additional relief as the Honorable Court may deem just.

## COUNT XI
## FALSE IMPRISONMENT/FALSE ARREST
### (arising under Florida law)
### (DEFENDANT GROB)

219.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 15 and 17 through 104, as if fully set forth herein.

220.    KIYANI did not commit any act justifying that detention, seizure, or arrest.

221.    Defendant GROB proximately caused the arrest of and did arrest KIYANI in the absence of probable cause or arguable probable cause that Plaintiff committed any criminal offense.

222.    Defendant GROB reviewed the video and spoke with KIYANI and Garcia, who both made clear that KIYANI did not touch her and did not intend to touch her.

223.    Though none of the elements of battery were present, evident from the words of Garcia and KIYANI, and from the video, Defendant GROB charged KIYANI with battery.

224.    Defendant GROB then arrested KIYANI, placing his hands behind his back, placing KIYANI into a police car, and transporting him to jail, where he remained overnight.

225.    Defendant GROB's charge of battery was not filed by the State Attorney.

226.    The conduct of GROB toward Plaintiff was objectively unreasonable and in violation of Plaintiff's clearly established rights to be free from arrest in the absence of probable cause.

227.    The actions of Defendant GROB, in causing the arrest of Plaintiff in the absence of probable cause, were taken in the absence of lawful authority. The actions of Defendant GROB constitute false imprisonment or false arrest of Plaintiff under Florida law.

228.    In the alternative to the allegations set forth in count IX, if Plaintiff's arrest by Defendant GROB was committed outside the course and scope of Defendant GROB's employment, or in bad faith or with malicious purpose or in a manner exhibiting wanton or willful disregard of human rights, safety, or property, the conduct of Defendant GROB occurred in his individual capacity.

229.    As a direct and proximate result of the acts alleged herein, in violation of 42 USC §1983, Plaintiff has suffered damages. He has been brought into public scandal, with great humiliation, mental suffering, and a damaged reputation. Plaintiff lost his freedom and liberty resulting in pain and suffering, mental anguish, and medical and legal expenses. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit;(d) attorney fees; and (e) Such additional relief as the Honorable Court may deem just.

## COUNT XII
### 42 USC §1983 (*MONELL LIABILITY*)
### DELIBERATE INDIFFERENCE AND/OR UNCONSTITUTIONAL POLICY AND/OR FAILURE TO TRAIN OR SUPERVISE
### (DEFENDANT PBSO)

230.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

231.    At all times relevant, the individual Defendants were under the direction, supervision, and control of Defendant PBSO.

232.    At all times relevant, Defendant PBSO had a pervasive custom or policy of deliberate indifference toward the rights of unwed fathers in that PBSO Officers take it upon themselves to be the arbiters of civil custody disputes, resolving the disputes in favor of the mother, and causing minor children to be moved from the custody of the unwed father to the mother.

233.    PBSO has a pervasive custom or policy of allowing PBSO officers to act in lieu of court order when PBSO Officers should do nothing more than instruct parties to a civil custody dispute to pursue court action.

234.    PBSO's pervasive custom or practice of deliberate indifference is demonstrated by PBSO's:

   a. failing to institute a policy or training addressing civil child custody disputes and the limited scope of Police Officer jurisdiction;
   b. failing to institute a policy or training regarding civil child custody disputes and the appropriate response of advising the parties to obtain relief in court and not by way of an officer's intervention
   c. failing to institute a policy or training to prevent police officers from facilitating the movement of a child from the unwed father to mother
   d. failing to ensure officers were trained or sufficiently educated in child custody disputes and their role as "peacekeeper", not arbiters of disputes;
   e. improperly training PBSO Officers in a way that condones and permits their officers to violate the rights and inflict harm upon citizens exercising their constitutional rights.
   f. Failing to train officers as to the constitutional right of privacy and to be free from unwarranted governmental interference
   g. Deliberate indifference by failing to ensure Officers are properly reviewed, counseled, educated, and trained regarding First Amendment speech rights

235.    PBSO's deliberate indifference, failure to train, failure to effectively supervise, and tolerance of the practices stated above was the moving force that caused the unlawful deprivation of Plaintiff's constitutional rights, including Plaintiff's Federal First, Fourth, and Fourteenth Amendment Rights and Privacy Rights under the Florida Constitution

236.    Though Defendant PBSO is and was aware that a pattern of constitutional violations exists due PBSO's failure to train and/or supervise, PBSO failed to take remedial action thereby ratifying the misconduct alleged herein.

237.    As a direct and proximate result of the acts and omissions described above, Plaintiff was wrongly detained, seized, and arrested, and has suffered damages.

238.    Plaintiff lost his freedom and liberty, resulting in pain and suffering, mental anguish, medical and legal expenses, and damage to his reputation. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit;(d) attorney fees; and (e) Such additional relief as the Honorable Court may deem just.

### COUNT XIII
### 42 U.S.C. § 1983
### FAILURE TO SUPERVISE OR INTERVENE
### (DEFENDANT PEREZ)

239.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

240.    Prior to his arrest, while being detained, KIYANI, a Sergeant, called on-duty Captain PEREZ to notify him that the officers under his supervision and control were attempting to remove Plaintiff's daughter from his custody.

241.    In other words, Plaintiff was informing Captain PEREZ that his subordinates were effectively adjudicating a civil custody dispute.

242.    PEREZ failed to respond, intervene, or stop the unlawful acts of those in his command though he knew at the time, based on KIYANI's call, that Perez's subordinates would

act unlawfully by adjudicating a civil custody dispute instead of directing the parties to obtain relief in a court proceeding.

243.    Perez's failure to instruct his subordinates to refrain from resolving a civil custody matter resulted from PBSO and Perez's improper custom or policy resulting in deliberate indifference to Plaintiff's constitutional rights as a parent.

244.    As a direct and proximate result of Perez's failure to supervise his subordinates or to intervene, in violation of 42 U.S.C. § 1983, Plaintiff has suffered damages. He has been brought into public scandal, with great humiliation, mental suffering, and a damaged reputation. Plaintiff lost his freedom and liberty resulting in pain and suffering, mental anguish, medical and legal expenses. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit;(d) attorney fees pursuant to 42 U.S.C. § 1988; and (e) Such additional relief as the Honorable Court may deem just.

**COUNT XIV**
**42 U.S.C. § 1983**
**FAILURE TO INTERVENE**
**(DEFENDANT GUEVARA)**

245.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

246.    At all times relevant, Guevara, who arrived the scene before Grob, was aware of the absence of probable cause or arguable probable cause to arrest KIYANI.

247.    At all times relevant, Guevara knew that no battery had occurred as Garcia fell unintentionally as KIYANI turned away with the baby in his arms.

248.    Upon information and belief, Guevara failed to advise Grob that Responding Officers already determined that Garcia fell unintentionally as KIYANI turned away with the baby in his arms.

249.    Despite his awareness of the absence of probable cause or arguable cause, Guevara participated and aided Grob in the unlawful arrest.

250.    Among other things, Guevara participated in the interview of Garcia and later escorted and transported KIYANI to the county jail in Guevara's patrol car.

251.    As a direct and proximate result of the acts alleged herein by Guevara, in violation of 42 U.S.C. § 1983, Plaintiff has suffered damages. He has been brought into public scandal, with great humiliation, mental suffering, and a damaged reputation. Plaintiff lost his freedom and liberty resulting in pain and suffering, mental anguish, medical and legal expenses. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages greater than $100,000.00; (b) Judgment for punitive or exemplary damages; (c) Cost of suit;(d) attorney fees pursuant to 42 U.S.C. § 1988; and (e) Such additional relief as the Honorable Court may deem just.

**COUNT XV**
**FIRST AMENDMENT FREE SPEECH RETALIATION,**
**COGNIZABLE UNDER 42 U.S.C. §1983**
**(DEFENDANT RICHTER)**

252.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

253.    A public employee's speech on matters of public concern may be restricted only if "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs "the interests of the [employee], as a citizen, in

commenting upon matters of public concern." *Harris v. Quinn*, 573 U.S. 616, 653, 134 S. Ct. 2618, 2642 (2014) (quoting *Pickering v. Board of Ed. Of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968). "So long as employees are speaking as private citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employees to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).

254.    Defendant Richter made threats of discipline against Plaintiff for his protected written speech made as a private citizen of public concern requesting information on PBSO's policies regarding firearms placed into evidence.

255.    Defendant Richter actually and intentionally retaliated against Plaintiff for his protected speech, in a gross disregard of Plaintiff's constitutional rights under color of law.

256.    The acts of Defendant Richter violate the protections afforded to PBSO's public employees pursuant to the First Amendment and controlling precedent.

257.    No known policy restricts PBSO employees acting in their capacity as private citizens from requesting information regarding matters of public concern.

258.    Defendant Richter's actions violate Plaintiff's clearly established First Amendment rights and violate 42 U.S.C. §1983.

259.    Defendant Richter's retaliation would chill a person of ordinary firmness from continuing to engage in that protected activity.

260.    As a result, Plaintiff suffered adverse employment action in the form of a 8-hour suspension without pay, resulting in pain and suffering, mental anguish, medical and legal expenses, and damage to reputation. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages; (b) Judgment for punitive or exemplary damages; (c) Cost of suit;(d) attorney fees

pursuant to 42 U.S.C. § 1988; and (e) Such additional relief as the Honorable Court may deem just.

**COUNT XVI**
**FIRST AMENDMENT FREE SPEECH RETALIATION,**
**COGNIZABLE UNDER 42 U.S.C. §1983**
**(DEFENDANT SAFFORD)**

261.    Plaintiff KIYANI repeats and realleges Paragraph 1 through 104, as if fully set forth herein.

262.    A public employee's speech on matters of public concern may be restricted only if "the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees" outweighs "the interests of the [employee], as a citizen, in commenting upon matters of public concern." *Harris v. Quinn*, 573 U.S. 616, 653, 134 S. Ct. 2618, 2642 (2014) (quoting *Pickering v. Board of Ed. Of Township High School Dist. 205, Will Cty.*, 391 U.S. 563 (1968). "So long as employees are speaking as private citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employees to operate efficiently and effectively." *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006).

263.    Defendant Safford sought out Defendant Obray for his investigation the same day Defendant Richter threatened Plaintiff with discipline in response to Plaintiff's protected written speech made as a private citizen of public concern.

264.    Though Obray had not complained of or reported any insubordination, Defendant Safford ultimately sought out Obray to find a basis to punish Plaintiff for his protected speech: he added an Insubordination charge against Plaintiff for addressing Defendant Obray by her first name, Jerry.

265.    Like his superior Defendant Richter, Defendant Safford actually and intentionally retaliated against Plaintiff for his protected speech, in a gross disregard of Plaintiff's constitutional rights under color of law.

266.    The acts of Defendant Safford violate the protections afforded to PBSO's public employees pursuant to the First Amendment and controlling precedent.

267.    No known policy restricts PBSO employees acting in their capacity as private citizens from requesting information regarding matters of public concern.

268.    Defendant Safford's actions violate Plaintiff's clearly established First Amendment rights and violate 42 U.S.C. §1983.

269.    Defendant Safford's retaliation would chill a person of ordinary firmness from continuing to engage in that protected activity.

270.    As a result, Plaintiff suffered adverse employment action in the form of a 8-hour suspension without pay, resulting in pain and suffering, mental anguish, medical and legal expenses, and damage to reputation. The losses are permanent or continuing in nature.

WHEREFORE, Plaintiff prays for relief as follows: (a) Judgment for compensatory damages; (b) Judgment for punitive or exemplary damages; (c) Cost of suit;(d) attorney fees pursuant to 42 U.S.C. § 1988; and (e) Such additional relief as the Honorable Court may deem just.

### DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable within this Complaint.

Dated: September 10, 2024                    Respectfully submitted,

CRISCIONE RAVALA, LLP

/s/ Galen J. Criscione
By: Galen J. Criscione, Esq.

FL Bar No: 0088593
110 E. Broward Blvd.
Ft. Lauderdale, FL 33301
Ph: (800) 583-1780, Ext. 501
Fax: (800) 583-1787
gcriscione@lawcrt.com
*Attorneys for Plaintiff*